Filed 4/30/14  In re S.W. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re S.W. et al., Persons Coming Under the Juvenile Court Law. | |
| TULARE COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>S.W. et al.,<br><br>Defendants and Appellants. | F067780<br><br>(Super. Ct. Nos. JJV066018A & JJV066018B)<br><br>**OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Tulare County.  Hugo J. Loza, Commissioner.

Michelle E. Danley and Carol Koenig, under appointment by the Court of Appeal, for Defendant and Appellant father.

Marsha F. Levine, under appointment by the Court of Appeal, for Defendant and Appellant mother.

Kathleen Bales-Lange, County Counsel, John A. Rozum and Abel C. Martinez, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

J.S. (mother) and S.W. (father) appeal from the juvenile court's order terminating their parental rights (Welf. & Inst. Code,[1] § 366.26) to their daughters, S. and A. (collectively, the children or the girls).[2]  Mother contends the juvenile court erred when it found the parental benefit exception in section 366.26, subdivision (c)(1)(B)(i) did not apply because the record showed she had a beneficial relationship with the children. Father, who was a noncustodial parent at the time of the children's detention, contends his parental rights were terminated in violation of his due process rights because the court never found by clear and convincing evidence he was an unfit parent.  He also claims the court erred when it found the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.; ICWA) did not apply.  We affirm.

## PROCEDURAL AND FACTUAL BACKGROUND

### Section 300 Petition

On February 10, 2012, the respondent, Tulare County Health and Human Services Agency (the agency), filed a section 300 petition on behalf of S., who was then four years old, and her sister A., who was three years old.  The petition alleged mother's aggressive physical conduct towards S. placed both the girls at a substantial risk of suffering serious physical harm (§ 300, subd. (a)), and stated the following facts in support of the allegation:

> "On or near 2/9/2012, the mother kicked at a public bathroom door while [S.] was using the bathroom.  The mother was also yelling and cursing at the child.  Earlier that morning the mother hit [S.] with an open hand on the top of her head.  [S.] stated that her mother had hit her and that her arm hurt; the child's left arm had a small scratch on it.  [S.] stated the mother had grabbed her by her neck on the previous night, 2/8/2012.  On 2/9/2012, the mother admitted to having a loose temper and anger issues."

---

[1]    Further statutory references are to the Welfare and Institutions Code unless otherwise specified.

[2]    We refer to certain persons by their abbreviated names in accordance with our Supreme Court's policy regarding protective nondisclosure of identity. No disrespect is intended

With respect to father, the petition alleged under section 300, subdivision (g), that the children had been left without provision for support:

> "On or near 2/8/2012, the father … informed the social worker that he does not have a place to care for the children at this time. [Father] stated that his parents do not have room for the children as his parents are currently in the process of adopting his two older children. [Father] is unable or unwilling to provide care or support for the children at this time. There are no known relatives willing or able to provide care or support for the child[ren] at this time."

### *Detention Report and Hearing*

In the detention report, the social worker recommended that the juvenile court find the ICWA did not apply, reporting that on February 8, 2012, mother denied she or the children might have any American Indian ancestry and "signed the ICWA 20 stating such." The same day, father stated he might "have Indian ancestry through his paternal great grandmother" and "signed the ICWA 20 stating that he may be Cherokee." However, "[o]n February 9, 2012, upon further investigation …, the paternal great grandmother, stated that she was not a recognized member of the Cherokee Tribe."

The social worker reported additional details about his first contact with father on February 8, 2012. The social worker met father around 1:00 p.m. Father said he had received a text message from mother asking him to pick up the children at the courthouse. When he arrived at the courthouse, the bailiff told him to wait and then directed him to see the social worker. Father informed the social worker he did not have a permanent address and was renting a room from a friend. Father said, "There is no way I can take both girls into my care at this time." Father said he did not have the means to provide for children at that time.

Father also told the social worker that he had four children with mother, and that their two sons were in the care of father's parents, who were in the process of adopting the boys. Father explained his parents had been the boys' guardians for the past year because he and mother were unable to care for them. Father said he did not know of any

3

relatives that would be able to care for the girls at that time. Father's parents could not care for them because they were already caring for the boys.

Father told the social worker he was "Native American and that his mother was in the process of getting documentation to be recognized from the Cherokee Tribe."

Father also said "he would like help with parenting, because as a parent one is never 'a perfect parent'" and "he would also like help finding a stable and permanent home."

On February 14, 2012, mother and father both appeared with counsel at the detention hearing. The juvenile court asked the parents if they were members of, or eligible for membership, in a Native American tribe. Both parents answered, "No." The juvenile court then found there was "insufficient reason to believe that [the children] are or may be Indian children." The court thereafter ordered the children detained.

### *Jurisdiction/Disposition*

The jurisdiction/disposition report recommended the children remain in out-of-home care and be adjudged dependents of the juvenile court "due to abuse/neglect issues by the mother and the father." The report noted that father had "failed to protect the children from the mother's ongoing abuse and neglect" and reported that, on February 17, 2012, father revealed "he was aware the mother and her current husband … were in a domestic violence relationship and he failed to remove [the children] from the household." The agency concluded that "father's failure to protect has led the children to be exposed to the mother's anger issues and continued exposure to domestic violence."

The report indicated the agency had considered placing the children with father, the noncustodial parent (§ 361.2); however, father "did not/is not requesting placement of the children." Instead, on February 8 and February 17, 2012, father stated "he does not have a permanent address or the financial means to support two (2) young girls" and "feels they would be best cared for in out of home placement at this time."

4

With respect to the children's ICWA status, the report stated: "On February 14, 2012, at the Detention Hearing the Court found the [ICWA] does not apply."

At the combined jurisdictional/dispositional hearing on March 6, 2012, the court accepted father's offer of proof that, although he was currently unable to care for the children, he was willing to provide care and support for them. After the parents submitted the matter of jurisdiction to the agency's report and father's stipulation, the court struck the allegation that father was unwilling to care for the children and found the amended section 300, subdivisions (a) and (g) allegations to be true.

The juvenile court further found there was clear and convincing evidence that there was a substantial danger to the children's physical health, safety, protection or physical or emotional well-being if they were returned home to mother.

In adopting the recommended findings and orders of the agency, the juvenile court ordered reunification services for both parents and twice-a-week visits with the children with supervised visits for mother and unsupervised visits for father.

### Six-month Review

The agency's report for the six-month review hearing reflected that on April 23, 2012, father told the social worker he was unable to care for the children at that time because of "his current housing situation and busy work schedule." The report also noted that father was referred to parenting education on February 17, 2012. However, on May 24 and on July 5, 2012, father told the social worker he was unable to participate in parenting education due to his work schedule. The report further noted that "father has not been in consistent contact with the Agency; however, he does make himself available via phone but no-shows to several scheduled individual contacts."

At the six-month review hearing, father's counsel informed the juvenile court that father was requesting in-home parenting classes because of his work schedule. The court told father this would not be possible after confirming with agency's counsel that "in-home parenting is only available if the children are in the home." The court went on to

5

adopt the findings and orders of the agency, finding, among other things, that returning the children to mother and father would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the children.

### *Twelve-month Review*

In the report prepared for the 12-month review hearing, the agency recommended terminating reunification services for both parents and setting a section 366.26 hearing. Although mother was compliant with her therapeutic services, she had not been able to make therapeutic progress and father had failed to complete the parenting education component of his case plan.

The agency reported that father continued to be inconsistent with his contacts with the agency, noting father did not respond to attempted contacts in August and October 2012. When the social worker was able to make telephone contact with father on November 15, 2012, the social worker asked father about his inconsistent contact. Father stated he had been busy with work but was currently unemployed. When asked whether he had enrolled in parent education, father said no but said he would be enrolling and requested contact information for family services, which the social worker provided.

At the contested 12-month review hearing on March 20, 2013, father testified that he was participating in parenting education and had five classes left. Father stated he would like more services, including individualized therapy. Father further testified, "I have stated that I could use help with a place to live so I could get my children back."

Regarding the issue of housing, father testified on cross-examination as follows:

"[AGENCY'S COUNSEL]: Q. And you stated that you needed help with housing and you asked the social worker.

"Which social worker did you ask for housing?

"[FATHER]: A. The first one I stated it to was the initial person that took the report on the day the girls were taken away.

6

"Because he asked me what services I needed. I volunteered for parenting classes. And I also stated that I needed help with housing. That it would be nice if I could get some help getting a place of my own.

"Q. Have you tried applying for housing on your own for example, Section Eight housing?

"A. I've heard rumors about that one. They are closing it down.

"Two, the waiting list is at least four years long.

"THE COURT: So the answer is no, sir?

"[FATHER]: Yes."

Father acknowledged he asked for a list of parenting classes in September 2012, and that he was referred again on November 21, 2012.

The juvenile court went on to adopt the findings and recommendations of the agency, terminating reunification efforts for both parents and setting a section 366.26 hearing to select permanent plans for the children. The court observed: "It is clear to me that mom has done everything she was asked to do. Father has not. The problem is that even with mom doing what she was asked to do, she has not been able to make the therapeutic progress where I could return the kids or whether I would even conceive of returning the kids if services were continued another six months."

### Section 366.26 Hearing

The agency's report for the section 366.26 hearing reflected that, for a majority of the dependency proceedings, the children had lived with their maternal grandparents, with whom they were placed in late March 2012. The grandparents were committed to adopting the children and were meeting their needs, and the children had progressed in their grandparents' care. Consequently, the agency recommended that the court find the children adoptable and terminate parental rights.

At the section 366.26 hearing on July, 31 2013, mother testified that she had supervised visits with the children once a week for two hours. She maintained regular

7

and consistent visits with the children and the visits went well. During visits, they would play and do various activities together. Mother felt she had a very special parent/child bond with the children. The children would run to mother and give her a hug at the beginning and tell her they loved her at the end of visits. The children referred to mother as "Mom." The children referred to their maternal grandmother as "Ya Ya." However, sometimes in mother's presence they referred to their grandmother and her husband as "their parent."

Father testified that he visited the children every other week for four hours. He enjoyed visiting the children. The visits took place at "a McDonald's play place." They would start by eating lunch together and then he would let the children play in the play area. The children called father "Dad" or "Daddy" and they would exchange hugs with him during visits. Father felt very attached to the children, and felt it would be very detrimental to the children to break the bond he had with them. Sometimes the children would throw a tantrum or misbehave during father's visits with them. When this would happen, father would have them sit down, talk to them about their behavior, and let them know they were in "time out." Father learned about "time outs" in parenting class. Father's goal was to bring the children home. Father did not have a home at the moment but was working towards one. He was currently employed as a warehouse janitor for a dairy company.

The children's maternal grandmother testified she had the children with her "off and on almost all their lives." The children would sometimes misbehave because they were typical children. However, in the grandmother's opinion, the children misbehaved more often after visits with their parents. Even though mother was her daughter, the grandmother no longer had contact with mother, explaining: "Too many lies, too many deceiving, it hurts."

After the grandmother testified, the agency submitted the matter on the reports. Following argument, the juvenile court found the children adoptable and terminated

8

parental rights. The court specifically rejected the parents' arguments that the beneficial relationship exception was applicable to prevent termination of parental rights.

## *DISCUSSION*

### I.     *Beneficial Relationship Exception*

Mother contends the juvenile court erred by failing to apply the beneficial relationship exception to termination of her parental rights to the children. We disagree and conclude the juvenile court properly found the beneficial relationship exception inapplicable with respect to both mother and father.[3]

#### A.     *Applicable Legal Principles*

The purpose of a section 366.26 hearing is to select and implement a permanent plan for the dependent child. (*In re S.B.* (2009) 46 Cal.4th 529, 532.) The Legislature's preferred permanent plan is adoption. (*In re D.M.* (2012) 205 Cal.App.4th 283, 290.) "At a section 366.26 hearing, the court must terminate parental rights and free the child for adoption if [1] it determines by clear and convincing evidence the child is adoptable within a reasonable time, and [2] the parents have not shown that termination of parental rights would be detrimental to the child under any of the statutory exceptions to adoption found in section 366.26, subdivision (c)(1)(B)(i) through (vi). (§ 366.26, subd. (c)(1).)" (*In re D.M.*, *supra*, 205 Cal.App.4th at p. 290.)

To avoid termination of parental rights under the beneficial relationship exception, the juvenile court must find "a compelling reason for determining that termination would be detrimental to the child due to [the circumstance that the] parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) It is the parent's burden to prove the exception applies. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 574 (*Autumn H.*).)

---

[3]     Although father does not address the issue directly, we assume he adopts mother's arguments concerning the beneficial relationship exception based on his reply brief which states he joins in mother's briefs pursuant to California Rules of Court, rule 8.200(a)(5).

The Court of Appeal in *Autumn H., supra,* defined a beneficial relationship as one that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (27 Cal.App.4th at p. 575.) "[T]he court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid.*)

A parent must show more than frequent and loving contact or pleasant visits for the exception to apply. (*In re C.F.* (2011) 193 Cal.App.4th 549, 555; *In re C.B.* (2010) 190 Cal.App.4th 102, 126; *In re I.W.* (2009) 180 Cal.App.4th 1517, 1527.) "The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment between child and parent. [Citations.] Further, to establish the section 366.26, subdivision (c)(1)(B)(i) exception the parent must show the child would suffer detriment if his or her relationship with the parent were terminated. [Citation.]" (*In re C.F., supra,* 193 Cal.App.4th at p. 555.)

There is a split of authority concerning the standard of review in this context. "Most courts have applied the substantial evidence standard" (*In re K.P.* (2012) 203 Cal.App.4th 614, 621), while "at least one court has concluded that it is properly reviewed for an abuse of discretion" (*ibid.*). A third approach "incorporates both ... standards" (*ibid.*), reviewing for substantial evidence "whether a beneficial parental ... relationship exists" (*id.* at p. 622), and for abuse of discretion "whether the existence of that relationship ... constitutes 'a compelling reason for determining that termination would be detrimental to the child[]'" (*ibid.*). Under any of these approaches, the juvenile court here properly rejected the beneficial relationship exception and terminated paternal rights for both parents.

10

### B. *Analysis*

Mother asserts, "All that is required for application of the benefit exception is a relationship that is strong enough to benefit the child and which would cause detriment if terminated." Because she "visited the children regularly and consistently, because she and the children shared a bond, and because the impact upon the children of the juvenile court's decision to remove her from their lives forever is unknown," mother contends, "it cannot be said that adoption *substantially* outweighs the benefit to the children of maintaining their relationship with mother." Mother concludes "because the evidence establishes that the [beneficial relationship] exception *does* apply, the court erred in terminating mother's parental rights."

Mother's arguments are inconsistent with the well-established mass of authority summarized above. A beneficial relationship is not, as mother claims, one "strong enough to benefit the child and which would cause detriment if terminated," but rather "'one that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." [Citation.] The existence of this relationship is determined by "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs." [Citation.]' [Citation.]" (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643.)

Although the parents here maintained regular visitation and contact with the children, they did not meet their burden of proving the children would benefit from continuing their relationship with the parents, as the parents had not shown that relationship promoted the children's well-being to such a degree that it outweighed the well-being the children would gain in a permanent home with the prospective adoptive parents, the children's maternal grandparents. Substantial evidence supports the juvenile court's implied finding at the section 366.26 hearing that the parents did not occupy a parental role in the children's life. As the court observed, this role has been occupied

11

primarily by the children's maternal grandmother, not only during the dependency proceedings but also throughout the children's young lives. The evidence showed the children looked to the maternal grandparents as parental figures and progressed in the stable environment the grandparents provided for them.

On this record, the juvenile court reasonably could find the children's need for permanence outweighed the benefits they would derive from a continued relationship with their parents. It also could find that severing the children's relationship with the parents would not deprive them of a substantial, positive emotional attachment that would greatly harm them. Even if mother is correct that "there is considerable evidence in the record which supports the opposite conclusion," we defer to the juvenile court, whose "role to assess the credibility of the various witnesses, to weigh the evidence to resolve the conflicts in the evidence.... [W]e must accept the evidence most favorable to the order as true and discard the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact. [Citation.]" (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53.)

For all these reasons, we conclude the juvenile court did not err by failing to apply the beneficial relationship exception to the termination of parental rights.

## II. Due Process

Father contends the juvenile court's termination order violated his due process rights because the court never made a finding by clear and convincing evidence that he was an unfit parent. We disagree and conclude no due process violation occurred.

### A. Applicable Legal Principles

Because parents have a fundamental interest in the care, companionship, and custody of their children, they are entitled to certain due process protections in state dependency proceedings. (*Santosky v. Kramer* (1982) 455 U.S. 745, 758 (*Santosky*).) In particular, before a state may sever completely and irrevocably the right of parents in their natural child, due process requires that the state supports its allegations by at least

12

clear and convincing evidence. (*Id.* at pp. 747-748.) Once a state has established parental unfitness, the court may assume that the interests of the child and the natural parents diverge. (*Id.* at p. 760.) However, until the state proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship. (*Ibid.*)

California's dependency system comports with *Santosky*'s requirements because, by the time parental rights are terminated at a section 366.26 hearing, the juvenile court should have made prior findings that the parent was unfit. (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 254 (*Cynthia D.*); *In re Gladys L.* (2006) 141 Cal.App.4th 845, 848.)

> "Except for a temporary period, the grounds for initial removal of the child from parental custody have been established under a clear and convincing standard (see § 361, subd. (b)); in addition, there have been a series of hearings involving ongoing reunification efforts and, at each hearing, there was a statutory presumption that the child should be returned to the custody of the parent. (§§ 366.21, subds. (e), (f), 366.22, subd. (a).) Only if, over this entire period of time, the state continually has established that a return of custody to the parent would be detrimental to the child is the section 366.26 stage even reached." (*Cynthia D., supra,* 5 Cal.4th at p. 253.)

> As the *Cynthia D.* court reasoned,

> "The number and quality of the judicial findings that are necessary preconditions to termination convey very powerfully to the fact finder the subjective certainty about parental unfitness and detriment required before the court may even consider ending the relationship between natural parent and child." (*Cynthia D., supra,* 5 Cal.4th at p. 256.)

### B.     Analysis

Father correctly notes that at the combined jurisdictional/dispositional hearing in March 2012, the juvenile court found by clear and convincing evidence that it would be detrimental to return the children to mother's custody but made no detriment finding as to father. However, the court subsequently made the necessary findings of detriment to overcome the statutory presumption requiring return of the children to both mother and

13

father at the six-month and 12-month review hearings in August 2012 and March 2013. (See § 366.21, subd. (e), 1st par. [return "unless the court finds, by a preponderance of the evidence, that the return of the child to … her parent … would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child"].)

Contrary to father's assertion, the juvenile court here did not fail to state a basis for its detriment findings against him. Rather, the court expressly adopted the findings and orders of the agency. Thus, at the time of the six-month review hearing, the agency found returning the children to father's custody would be detrimental based on father's failure to initiate parenting education and remain in consistent contact with the agency. At the time of the 12-month review hearing, the agency again found return to father would be detrimental because he had "failed to participate regularly and make substantive progress in court ordered treatment programs." (See § 366.21, subd. (e), 1st par. ["The failure of the parent … to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental"].) We conclude the juvenile court's *repeated* detriment findings against father which were supported by substantial evidence, satisfied due process under the legal principles set forth, even though they did not contain explicit references to the clear and convincing evidence standard.

In arguing otherwise, father contrasts this case with *In re P.A.* (2007) 155 Cal.App.4th 1197, 1212, where detriment findings by clear and convincing evidence were implied because there was substantial evidence the father there had persistently sought to avoid responsibility for his child and failed to visit for long stretches at a time. Unlike the father in that case, father asserts he "visited regularly" and the agency never noted "a lack of parenting skills" or sought to change his visits with the children from unsupervised to supervised visits. Father acknowledges he failed to complete parenting education, which was the main component of his case plan, but he discounts this failure,

14

asserting "participation in the parenting classes should not be a prerequisite for a parent who has shown no significant lack of parenting skills." Father also asserts he was unable to attend parenting classes due to his work schedule and suggests he made a good faith attempt to rectify this by requesting in-home parenting classes.

We find father's arguments unpersuasive and conclude findings of detriment by clear and convincing evidence may be inferred from the record in this case notwithstanding evidence that father visited the children regularly and the visits raised no concerns for the agency. Contrary to father's suggestion, his failure to complete parenting education was significant because, like his failure to keep in consistent contact with the agency, it was indicative of an avoidance of responsibility and lack of commitment to meeting the prerequisites for reunification with his children. At the time of the children's detention in February 2012, father specifically requested and indicated a need for help with parenting. However, despite being referred to parenting classes on numerous occasions and being directly informed that in-home parenting education was unavailable at the six-month review hearing in August 2012, father continued to be inconsistent in his contacts with the agency and did not commence his first parenting education course until late November 2012. Moreover, the record shows that, despite expressing a general desire to reunify with the children someday, father never actually sought custody of the children. The agency's report for the 12-month review hearing noted that father had "continuously stated he [was] unable to care for the children and meet their basic and emotional needs" and "if he and the mother fail[ed] Family Reunification Services he would like the children to remain with the current relative caretakers and be adopted." These circumstances constitute substantial evidence that it would be detrimental to place the children in father's custody.

We also reject father's attempt to cast himself as a nonoffending parent who lost his parental rights due to his indigence, not his inability to parent. Father bases this characterization on the fact that he attributed his self-professed inability to care for the

15

children to his lack of adequate income and housing. However, the record does not establish the juvenile court terminated parental rights or made any findings against father on the basis of poverty or homelessness. Rather, as seen above, the court's detriment findings were based primarily on father's failure to comply with his case plan. Thus, this case is distinguishable from the ones on which father relies. (See, e.g., *In re P.C.* (2008) 165 Cal.App.4th 98, 103-107 [only alleged detriment from return to mother's custody after she completed her case plan was her inability to obtain suitable housing, which is not a valid basis for detriment finding] and *In re G.S.R.* (2008) 159 Cal.App.4th 1202, 1210-1216 [father nonoffending noncustodial parent, only alleged detriment was failure to find suitable housing due to poverty].)

Moreover, it is not entirely clear from the record that father's inability to care for the children was based solely on his financial circumstances. During the proceedings, he also cited his busy work schedule as a reason for not being able to care for the children. His desultory participation in his case plan also suggested unspoken reasons, such as lack of interest or motivation. Father's complaints that the agency failed to assist him in finding housing are also uncompelling in light of evidence he failed to keep in regular contact with the agency and failed to make any efforts on his own with which the agency might have assisted him. We disagree with father's assertion that "in terminating reunification services, the court blamed [father] for the agency's failure to provide these services." The court did not so much blame father as observe his demonstrated lack of "any efforts to take care of himself." The record as a whole supports the court's observation and reflects that father frequently offered excuses for, while making little effort to change, his situation.

We conclude the record shows no violation of due process.

### III. ICWA Challenge

Father contends the juvenile court erred in finding the ICWA did not apply and in terminating his parental rights without requiring the agency to comply with the ICWA's

16

notice provisions. The agency argues this case is controlled by our decision in *In re Pedro N.* (1995) 35 Cal.App.4th 183 (*Pedro N.*) and that father forfeited his right to challenge the juvenile court's ICWA finding. We agree with the agency.

In *Pedro N.*, *supra*, 35 Cal.App.4th at pages 185 and 189, we held that a parent who fails to timely challenge a juvenile court's action regarding the ICWA is foreclosed from raising ICWA issues (including alleged procedural infirmities) once the juvenile court's ruling is final, in a subsequent appeal from later proceedings. The proper time to raise such issues is after the dispositional hearing. The juvenile court's rulings and findings at the dispositional hearing are appealable upon a timely notice of appeal. We noted in *Pedro N.* that the parent there was represented by counsel and failed to appeal the juvenile court's orders from the dispositional hearing. (*Pedro N.*, *supra*, 35 Cal.App.4th at pp. 189-190.) The same is true of father in the instant proceeding and we disagree with his argument that *Pedro N.* is not applicable.

To the extent father relies on cases such as *In re Marinna J.* (2001) 90 Cal.App.4th 731, 737-739, *Dwayne P. v. Superior Court* (2002) 103 Cal.App.4th 247, and *In re B.R.* (2009) 176 Cal.App.4th 773, 779, cases that disagreed with *Pedro N.*, relying on the theory *Pedro N.* is inconsistent with the protections and procedures afforded by the ICWA to the interests of Indian tribes, we are not persuaded (see also *Nicole K. v. Superior Court* (2007) 146 Cal.App.4th 779, 783-785; *In re Antoinette S.* (2002) 104 Cal.App.4th 1401, 1413-1414). We decline father's invitation to revisit our holding in *Pedro N.*

We further note that *Pedro N.* does not foreclose a tribe's rights under the ICWA due to a parent's forfeiture or waiver of the issue for failing to file a timely appeal at the conclusion of an earlier proceeding. (*Pedro N.*, *supra*, 35 Cal.App.4th at pp. 185, 189-190; see *In re Desiree F.* (2000) 83 Cal.App.4th 460, 477-478 [wherein we reversed the juvenile court's denial of a tribe's motion to intervene after a final order terminating parental rights and invalidated actions dating back to outset of dependency that were

taken in violation of ICWA].)  In *Pedro N.*, we held we were addressing only the rights of the parent to a heightened evidentiary standard for removal and termination, not those of the tribe (*Pedro N.*, *supra*, 35 Cal.App.4th at p. 191), or, for that matter, the rights of the child.  As a result, we conclude father has forfeited his personal right to complain of any alleged defect in compliance with the ICWA.

### *DISPOSITION*

The orders terminating parental rights are affirmed.


_____
                                                                HILL, P. J.

WE CONCUR:


_____
LEVY, J.


_____
LAPORTE, J.*

---

\*     Judge of the Superior Court of Kings County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.